IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**BOBBY J. HOLT,**

    **Plaintiff,**

**v.**                                                      **CASE NO.  5:13-cv-100-RS-CJK**

**F/V SIR MARTIN E., INC., a Florida
Corporation, and MARTIN E. ARNOLD,
individually,**

    **Defendants.**
_____/

## ORDER

Before me are Plaintiff's Proposed Final Judgment with Findings of Fact and Conclusions of Law (Doc. 161), and Defendant's proposed Findings of Fact, Conclusions of Law and Final Judgment (Doc. 160-1). The bench trial was held on June 23, 2014.

## BACKGROUND

Plaintiff filed his Amended Complaint for damages, compensatory and punitive, maintenance and cure, unpaid wages, attorney's fees and costs, and pre-judgment interest. Plaintiff alleges his claims against Defendant Corporation and Defendant Arnold as a seaman under The Jones Act, 46 U.S.C. 30104, *et. seq.,* and under the substantive provisions of the General Maritime Law of the United States, including the warranty of seaworthiness. Plaintiff is also seeking to pierce the

corporate veil of Defendant Corporation, and to hold Defendant Arnold individually liable for all damages being sought.

In 2012, Plaintiff Bobby Holt performed work for the fishing vessels F/V Sir Martin E ("Sir Martin") and the F/V Wolf ("Wolf") on three separate occasions. Prior to working on the Sir Martin or Wolf, Plaintiff was self-employed. Then, in June 2012, he began his new trade as a commercial fisherman. The evidence is unclear regarding the length of time Plaintiff worked for the Wolf in June 2012. Nevertheless, from the testimony of Plaintiff and Charles Destifino, I find that Plaintiff was a deckhand on the Wolf for 7 days on the first trip, and either 2 or 3 days on the second trip. This totals approximately 216-240 hours.

At trial, Charles Destifino testified that he worked with Plaintiff on the Wolf in June 2012. According to Destifino, during the trip Plaintiff complained of a back injury caused by falling of the roof of his house. He also testified that the captain of the Wolf took Plaintiff back to shore prior to the conclusion of the trip because Plaintiff suffered a hand laceration caused by a hook. At trial, the Plaintiff admitted that he was "high" when he injured his hand with the hook, and that every time he went out on a commercial fishing vessel to work he consumed alcohol and smoked marijuana.

There is some evidence on the record that Plaintiff worked for Defendant Arnold to prepare the Sir Martin for the September 2012 fishing trip before it left

port. Defendant Arnold testified it was a simple task of working on the boat cooler, whereas Plaintiff testified it was several weeks of work. According to Plaintiff, the times of that work included about 1 1/2 days in June 2012 obtaining materials, and work of about 11 hours per day on average from July 11, 2012, until mid-August, 2012 – a total of approximately 385 hours.

The trip that is at issue occurred as follows: The Sir Martin departed on September 1, 2012, on a commercial fishing trip into the Gulf of Mexico with Zach Breeding as captain, and a crew consisting of Tim Mizelle, Craig Foster, Matt Downing, and Plaintiff. While there is some conflict in the testimony as to when the boat returned to port, it appears the vessel returned to port early in the morning on September 10, 2012 ("Fishing Trip"). At trial, I heard the testimony of all individuals who were present during the Fishing Trip except Craig Foster, who is now deceased. As for the facts relevant to Plaintiff's legal claims, Plaintiff's testimony differs substantially from the testimony of all other witnesses who were present during the Fishing Trip.

At the beginning of the Fishing Trip, Plaintiff worked without incident baiting hooks and doing other minor work. According to all other crew members, when the Sir Martin moved into deep waters and the fishing became difficult, Plaintiff quit working and complained that his back and sciatic nerve were hurting from a previous fall off the roof of his house. He lay in his bunk and did not work

for days, leaving his bunk occasionally to eat. The crew members testified that everyone on the boat believed Plaintiff was faking the severity of his symptoms and that he simply did not want to work. The crew also testified that Plaintiff was inconsistent about which leg was hurting. Plaintiff admitted that when the boat returned to shallower waters and the work became easier, he began working again, baiting hooks.

According to Plaintiff, a few days into the Fishing Trip he climbed onto the roof of the Sir Martin to retrieve a roll of carpet. Matt Downing and Captain Breeding both testified at trial that the carpet was located within reaching distance, and climbing on the roof was unnecessary. Additionally, they both testified that Plaintiff had never retrieved carpet from the roof and would not have been allowed to do so since he was new at commercial fishing.

Nevertheless, Plaintiff further testified that the seas were rough with six foot waves, and while he was climbing down from the roof by the hauling arm, his grip released and he fell face up with his feet toward the boat and head over the railing. While he testified in court that he held onto the hauling arm by wrapping his arms around it, he had clearly stated in his deposition a year prior to trial that he was holding onto the hauling arm only by his hands.

Next, he claimed that his free fall ended with his hitting the small of his low back against a metal railing that was in poor condition and weak in structure, and

the rest of his body seaward of the boat's railing. When questioned how he did not fall into the water, Plaintiff testified that the only thing that prevented him from falling overboard when his low back hit the rail was a small bait basket full of slimy, slippery bait that was secured to the outside of the ship's railing. All other crew members testified that the bait baskets on the Fishing Trip were secured inside the railing on the deck and not outside the railing.

Plaintiff then testified the rocking of the boat in the six foot seas caused his body to be brought back up to the boat, over the rail and to the deck where he landed on his side facing the boat cabin. He testified he did not fall into the sea, and he did not even touch the water, despite his 200 pound body landing with his head and upper back over the plastic bait basket that was secured on a weak railing while the boat was in six foot seas. He alleges that after he fell, he yelled for help, but no one helped him. I find from the testimony of Captain Breeding and other crew members that the vessel's diesel engine, hydraulic winch, and wave action on the hull created a level of noise sufficient to mask any sound Plaintiff may have made from any fall and subsequent cries for help.

Additionally, Plaintiff alleges Matt Downing was next to him and saw the entire episode of Plaintiff climbing on the roof, retrieving the carpet, and handing it down to Downing. However, Downing, a disinterested witness, does not corroborate Plaintiff's testimony. According to Downing, Plaintiff was never on

the roof and Plaintiff never handed him the carpet. Plaintiff testified no other crew member saw his fall or heard him yell for help. In contrast, the testimony of every crew member was that not only did Plaintiff not fall, but he never retrieved carpet from the roof during the Fishing Trip. Even though the testimony of each crew member individually may differ in some aspects, I find that the consistent testimony of the crew members collectively is credible.

Zach Breeding was an independent contractor of Defendant Corporation. As captain, Mr. Breeding was responsible for hiring the individuals to work on the boat and for paying them. The payment arrangement was as follows: the crew was fed while on the trip, and if the crew caught enough fish to cover the costs of the trip, the profits were shared by the crew. However, if the crew did not catch enough fish to cover the costs of the trip, the crew did not get payment for the trip. On the Fishing Trip, the crew did not catch enough fish to cover the costs of the trip so no payments were due to any crew members for the Fishing Trip, including Plaintiff. When Plaintiff learned that he was not only fired for failing to work the entire trip, but that he would not be paid for this trip, he told Mr. Breeding that he would sue Defendant Arnold because he fell off the roof of the boat.

At trial, the Plaintiff also presented the testimony of his wife, Jennifer Holt, and his friend, Willie Meredith. Both individuals testified regarding picking up Plaintiff from the dock after the Fishing Trip and their observations of Plaintiff's

symptoms. Mrs. Holt testified that Plaintiff called her, did not mention any injury, told her he was home, and asked her to pick him up. Mr. Meredith, on the other hand, testified that Plaintiff called and specifically said he was injured when he fell off the roof of the boat after he was changing a light. I find that the testimony of both Mrs. Holt and Mr. Meredith lack credibility.

Specifically, while he testified at trial that Plaintiff was unaware of his expectations of compensation, during deposition Mr. Meredith testified that he expects to be paid $25,000.00 to $30,0000.00 if Plaintiff wins his case. Additionally, he expects to be reimbursed for $5,000.00 in expenses. Mr. Meredith has a financial interest in the outcome of this case. Therefore, I find that Mr. Meredith's testimony is tainted and biased.

Also, despite Plaintiff's history of domestic abuse prior to the Fishing Trip, Mrs. Holt presented testimony at trial that they had a sound relationship prior to the accident and that the accident had taken a toll on the family unit. To the contrary, it appears from the testimony of Plaintiff that he was Baker Acted in May of 2011after he stated that at night he had been choking his wife, he had no memory of it, and he was afraid he would kill her. The medical records reflect that Plaintiff's wife thought "it's the spirits in the house" causing the Plaintiff's behavior.

Additionally, while testifying at trial, Plaintiff's wife adamantly denied that the Gulf County Sheriff's Department responded to a domestic violence call that occurred less than a month prior to the trial. The defense presented testimony from Captain Buchanan of the Gulf County Sheriff's Department confirming that a call had come from Plaintiff regarding physical abuse from Mrs. Holt, and that the Department had, in fact, responded to the domestic violence call. I find Mrs. Holt's testimony was untruthful and lacked credibility.

Further, the testimony of the Plaintiff's treating surgeon, Dr. Merle Stringer, is that, given the injury that was surgically repaired by Dr. Stringer three days after the fishing trip, it was Dr. Stringer's opinion that the Plaintiff could not, with the injury that required surgery, have continued to do any work on the boat and could not have disembarked the boat without assistance of others. The Plaintiff's testimony is that after a few days, and when back in shallower waters, he resumed work baiting hooks. He also testified that he disembarked without assistance and carried at least a ten pound bag of clothes to shore. All the other crew members testified that he did not appear to have any difficulty leaving the boat, gathering his belongings, and leaving the docks.

Moreover, Plaintiff has a history of dishonesty with health care providers. His propensity for untruthfulness is revealed in his medical records. For example, Plaintiff told his doctor that during the Fishing Trip "the Captain of the ship would

not bring him to shore, until the ship was boarded by the Coast Guard for routine inspection, and they found that he was injured, and the Coast Guard instructed the Captain to return to port." It is undisputed, however, that the Coast Guard *never* boarded the Sir Martin during the Fishing Trip or immediately following it.

Also, both of Plaintiff's treating physicians, Dr. Stringer and Dr. Weiner, presented their opinions through deposition testimony and both stated that the Plaintiff did not advise them of any pre-existing back problems or mental health issues. Dr. Weiner testified that he was unaware that Plaintiff had a history of mental health care that pre-dated the accident. For instance, Dr. Weiner was unaware that Plaintiff had been Baker Acted for strangling his wife in his sleep, had previously had other marital problems, had been a methamphetamine addict or had previously been prescribed drugs to control his depression and mood.

During trial, Plaintiff testified that he never took prescription drugs, such as Zoloft or Wellbutrin, used to control his depression and mood in the past. However, after being cross-examined with his previous deposition testimony, he conceded that he did in fact take the prescribed drugs. Plaintiff also testified that he was a recovering methamphetamine addict, but denied currently using any other illegal substances. During cross-examination, he admitted that he was untruthful and that he does smoke marijuana.

As for the history of pre-existing back problems, Plaintiff's medical records are wrought with evidence that Plaintiff's back problems pre-dated the September 2012 trip, and are unrelated to any work he performed for Defendant Corporation or for any company affiliated with Defendant Arnold. Plaintiff's medical records reveal the following pre-existing back problems:

> **November 29, 2010** - Plaintiff had x-rays done at Sacred Heart Hospital on the Gulf indicating that he had a fall with back pain. He had plain film x-rays of the lumbar spine performed.
>
> **December 3, 2010 -** Plaintiff was treated at Wewa Medical Center for chronic low back pain and numbness in his legs and back.
>
> **December 12, 2010-** Plaintiff presented to Wewa Medical Center where he was still complaining of low back pain and indicated that it got so bad over the holidays that he had to stay in bed mostly. He was still in a lot of pain with difficulty ambulating without pain. He tried to make an appointment over the last two weeks prior to the hospital visit at Wewa Medical Center but could not because he was told there were no appointment. **He had an MRI performed at Gulf Imaging MRI on that date which revealed that the same disc space that was the subject of the Complaint in this case, the L4-L5 disc space, had broad based protrusion with mild convexity to the posterior disc margin. Fluid was also present at the L4-L5 facets. The final impression was the Plaintiff had mild disc protrusions present at L3-L4, L4-L5 and L5-S1.**
>
> **March 8, 2011 -** Plaintiff was looking for refills of Tramadol that he had been using for his low back pain.
>
> **May 26, 2011 -** Within the Wewa Medical Center note, there is a discharge summary from Emerald Coast Behavioral after the patient left, that the patient did not tell the same story to their staff and so staff consulted with Chief Medical physician, Dr. Brown, about the patient and Dr. Brown decided the Plaintiff would be dismissed from the practice as a result of his dishonesty.

**May 29, 2011 -** Plaintiff stated that he had pain in his spine and needed Tramadol so he could do things with his son. Plaintiff says he won't take any more Tramadol and was pleading for just twenty (20) pills.

**August 8, 2012 -** Hospital visit Plaintiff was treated for right buttock pain, radiating down the back of the right leg with a burning quality and it was a result of a fall on a boat when he injured his back and pain radiated into his right hip and leg.

**August 18, 2012 -** Prior to the trip in question, the Plaintiff was treated for right hip pain and leg pain at Gulf Coast Medical Center. The injury asserted by the Plaintiff was referenced in the medical records as an injury to the low back at the L4-L5 disc space.

Upon cross-examination, Dr. Stringer revealed that he only learned through correspondence with Plaintiff's counsel that there had been a prior MRI of the same disc space. Further, Dr. Stringer was unaware of Plaintiff's pre-existing complaints of back problems. In his testimony, Dr. Stringer stated that the injury represented in the December 2010 MRI would not have required surgery, and Plaintiff would have been able to work a number of heavy jobs without significant difficulties. However, Dr. Stringer also testified that with the injury he performed surgery on, Plaintiff would not have been able to continue to work on the Sir Martin. It is undisputed that despite Dr. Stringer's opinion, Plaintiff did resume work on the Sir Martin after the alleged fall, and he was capable of leaving the boat without assistance.

In sum, the evidence presented does not support, by a preponderance of the evidence, that the Plaintiff was injured while on the Sir Martin on the Fishing Trip, nor did he aggravate a pre-existing injury or have a pre-existing injury that recurred because Plaintiff said his back injury was caused solely to the alleged fall on the Sir Martin.

## ANALYSIS

"The Jones Act provides a cause of action in negligence for 'any seaman' injured 'in the course of his employment.'" *E.g., Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995) (quoting 46 U.S.C. App. § 688(a) (*now codified as amended at* 46 U.S.C. § 30104)). A Jones Act claim has four elements: (1) plaintiff is a seaman; (2) plaintiff suffered injury in the course of employment; (3) plaintiff's employer was negligent; and (4) employer's negligence caused the employee's injury, at least in part. *E.g., McKinney v. American River Transp. Co.*, 954 F. Supp. 2d 799, 805 (S.D. Ill. 2013).

### *Seaman Status*

As an initial matter, the Parties dispute Plaintiff's status as a seaman under the Jones Act. The Supreme Court of the United States set out the standard for determining who is a "seaman" in *Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995). The Court developed a two prong test: 1) the employee's duties must "contribute to the function of the vessel or to the accomplishment of its mission;" and 2) seaman

"must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of *both* its duration *and* its nature." *Id.* at 368-69, 371 (emphasis added) (citations omitted); accord *Naquin v. Elevating Boats, LLC*, 744 F.3d 927, 932-35 (5th Cir. 2014); *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 61-62, 63 (2nd Cir. 2002). The threshold requirement is broad. All who work at sea in the service of a ship are deemed to contribute to a vessel's mission. *Chandris*, 515 U.S. at 368. I find that Plaintiff meets the threshold requirement.

For purposes of this Order, I will assume that Plaintiff was a "seaman" under the *Chandris* principle. The Supreme Court of the United States has adopted a rule of thumb (first expressed by the Fifth Circuit) that if an individual spends less than 30% of his time in service of a vessel in navigation, the individual does *not* meet the second prong of the seaman test. *Id*. at 371; accord *Clark v. American Marine & Salvage, LLC*, 494 Fed. Appx. 32, *34-35 (11th Cir.2012); *Naquin,* 744 F.3d at 934; *Roberts v. Cardinal Services, Inc.,* 266 F.3d 368, 374-75 (5th Cir. 2001). Plaintiff was a new deckhand and had worked in the commercial fishing industry for a short period of time – approximately 3 months. There is evidence in the record that during those 3 months he spent more than 30% of his time in service of a vessel.

*Maintenance and Cure*

Nevertheless, even if Plaintiff is a seaman, I find that Plaintiff has not proved the other elements of a Jones Act claim. Specifically, Plaintiff did not prove by a preponderance of the evidence the he injured himself while on the Sir Martin. "If a seaman becomes ill or injured while in the service of the ship, the seaman's employer and the ship's owner owe[s] the seaman room and board (maintenance) and medical care (cure) without regard to fault. *McBride v. Estis Well Service, LLC*, 731F.3d 505, 508 (5th Cir. 2013) (*rehearing en banc pending*); accord *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 487 (2005). It is a seaman's burden to prove his or her right to maintenance and cure, but all doubts are resolved in favor of the seaman. *McMillan v. Tug Jane A. Bouchard*, 885 F. Supp. 452, 459-60 (E.D.N.Y. 1995).

After considering the testimony and other evidence at trial, I find that Plaintiff did not injure himself on the Sir Martin during the Fishing Trip and that he did not aggravate a pre-existing injury or have a pre-existing injury that recurred. I do not find Plaintiff to be credible and that, at a minimum, he was inconsistent in his testimony. There was no reliable testimony at trial that corroborated Plaintiff's testimony. No one else on the ship saw Plaintiff climb on the roof, saw him fall, heard him yell for help, or noticed his absence after he allegedly retrieved the carpet from the roof. Moreover, the consistent testimony presented at trial was that during the Fishing Trip Plaintiff complained of back and

sciatic nerve pain from a fall of the roof of his house, not a fall from the roof of the boat. Additionally, contrary to Dr. Stringer's opinion that Plaintiff's injury would prevent him from completing any work, Plaintiff testified that a few days after the alleged fall he resumed working on the vessel.

Further, considering Plaintiff's large body at approximately 200 pounds, I find it incredible that Plaintiff lost his grip on the hauling arm and a small plastic bait basket prevented him from falling into the sea. Also, all other witnesses agree that the bait baskets on the Fishing Trip were tied *inside* the boat railing, not *outside* the boat railing. Mr. Downing provided clear and specific testimony about how the crew worked around the bait baskets located inside the boat railing.

Accordingly, Plaintiff has not proved by a preponderance of the evidence that an injury occurred and that he is entitled to maintenance and cure. I also necessarily find that Plaintiff has not proved the required elements for punitive damages, attorneys' fees, or costs.

*Seaworthiness*

If a seaman is injured by a ship's "operational unfitness," the seaman has a cause of action under general maritime law for unseaworthiness. *McBride*, 731 F.3d at 508. A plaintiff must prove that "unseaworthy condition played a *substantial part* in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probably consequence of the

unseaworthiness." *Brister v. AWI, Inc.*, 946 F.2d 350, 355 (5th Cir. 1991) (emphasis added). As explained above, Plaintiff has failed to prove that he was injured on the Sir Martin. Consequently, no unseaworthy condition played a role – much less a substantial part – in bringing about or actually causing injury to Plaintiff. Thus, Plaintiff's unseaworthiness claim is therefore barred.

*Share of Fish*

Plaintiff alleges that he was not paid for his share of the catch of the fish. As explained previously, the crew did not catch enough fish on the Fishing Trip to cover the costs of the trip; therefore, no one on the crew is owed money for the Fishing Trip, including Plaintiff.

*Piercing the Corporate Veil*

Plaintiff alleges that it is appropriate to pierce the corporate veil of Defendant Corporation and find Defendant Arnold individually liable. I have found Defendant Corporation is not liable. Therefore, Plaintiff's claim is moot.

## CONCLUSION

I find that Plaintiff did not prove by a preponderance of the evidence that an injury occurred while he was serving as a crew member on the Sir Martin E. Plaintiff Bobby Holt will take nothing from his action. I rule that Defendants F/V Sir Martin E, Inc., a Florida corporation, and Martin E. Arnold are the prevailing

parties and that I will reserve jurisdiction to determine entitlement and amount of any attorneys' fees and taxable costs.

**ORDERED** on September 26, 2014.

<u>/S/ Richard Smoak</u>
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**
